In the Matter of Bomanjee Byramjee Colah, a Lunatic.

a hundred dollars which could have been applied in satisfaction of the judgment, was sufficient.

ROBINSON and LARREMORE, JJ., concurred.

Judgment reversed.

---

IN THE MATTER OF BOMANJEE BYRAMJEE COLAH, A LUNATIC.

(Decided April 5th, 1875.)

The committee of the estate of a lunatic is an officer of the court in the same manner as a receiver, and in the absence of legislation on the subject, his compensation is to be determined by the court.

For fixing the compensation of such a committee, the court will have regard to the peculiar exigencies of the case. and is not restricted to the allowance of such sums as an executor or guardian in a similar case would be entitled to as statutory commissions.

In a peculiar case where the services of the committee were of an unusual and extraordinary nature, and included services which he was not strictly bound to render, and where by the devotion of a large amount of his time and personal attention, to the interests of the estate, and especially by his activity and vigilance he had recovered a large amount of property (over $60,000) belonging to the estate, the court allowed him for his services $5,000, although his commissions at the rate allowed to executors, guardians, &c., by the statute, would have only amounted to about $1,800.

The course and practice of the English courts on this point detailed and explained, and the decisions of the former Court of Chancery in this State on the same subject examined, and *Matter of Roberts* (3 Johns. Ch. 43), and *Matter of Livingstone* (9 Paige, 440), criticised and qualified. Per DALY, Chief Justice.

APPEAL from an order made at a special term of this court by VAN BRUNT, J., allowing to Nathaniel Jarvis, Jr., the committee of the estate of Bomanjee Byramjee Colah, a lunatic, the sum of $5,000 as a fair and reasonable compensation to him for his services as such committee from the time of his appointment (July 20th, 1870) up to October 31st, 1874.

In the Matter of Bomanjee Byramjee Colah, a Lunatic.

The committee of the lunatic, having served several years, on October 3d, 1874, presented a petition to this court, praying that a suitable allowance which he claimed should not be less than $5,000, should be made to him and set forth the grounds of his claims, as follows:

"That on or about July 20th, 1870, the said Bomanjee Byramjee Colah was declared a lunatic, and by order of this honorable court your petitioner was duly appointed the committee of his estate, being required by such order to give a bond for the faithful performance of his duties in the penalty of $45,000, which was done.

"That upon the commission, in the nature of a writ *de lunatico inquirendo*, issued by this court, upon which the said Colah was found and declared a lunatic, and unable to govern himself or manage his estate; just prior to your petitioner's appointment. as committee, as aforesaid, it appeared, from all the evidence then attainable as to the estate, that the same was about $38,000 in United States currency, and no more.

"That as such committee, in consequence of prevailing rumors that the said lunatic had brought with him, only a short time before, a large amount of English sovereigns, greatly exceeding the $38,000 aforesaid, your petitioner, through the employment of counsel, and a person acting as a detective, finally ferretted out, and through legal proceedings and daily attention for many weeks, obtained, a large amount of money belonging to said lunatic's estate, swelling such estate to upwards of $100,000, while he, at about the same time, caused an action to be commenced in this honorable court to recover several thousand dollars to which your petitioner believes the estate was and is still entitled, and which action is still pending; during all which time he suffered, and was obliged to suffer, many important and urgent matters to remain unattended to, causing to himself considerable outlay and loss.

"That, in pursuance of an order of this honorable court, made October 26th, 1871, the said lunatic was removed and taken to Bombay, where his family resides, and where, on his arrival, a committee of his estate and person was also duly ap-

In the Matter of Bomanjee Byramjee Colah, a Lunatic.

pointed, as appears by the various papers on the files of this court.

"That from the time of your petitioner's appointment to the present time very many motions in regard to the said lunatic and his estate have been made, and references ordered, and had occupied many days, to all of which, by the orders of this court, your petitioner was obliged to give his best attention personally and through counsel, and a motion is now pending to obtain the order of this court to allow the surplus of the estate to be transferred to Bombay, aforesaid, out of the jurisdiction of this court, where the said lunatic is.

"Your petitioner further shows, that no allowance or payment to him for his services, or any part thereof, in this matter has ever been made or paid ; and your petitioner feels that, before he is divested of the whole or the major part of the whole surplus of the estate of the said lunatic, and the same transferred to Bombay, that a suitable allowance should be made and paid to him ; and your petitioner craves to refer to all the voluminous other petitions and papers and orders of this court, on file, in confirmation of the very many onerous duties, and extraordinary care, time and attention that he has given, and been obliged to give, in increasing and taking care of the said estate ; and your petitioner respectfully submits that he should be allowed to be paid, under the order of this court, out of the present fund in his hands, the sum of five thousand dollars, as a just, proper and reasonable allowance to him for his services as committee of the said estate to the date of this petition."

This petition was verified by his oath, and was supported by the affidavit of A. O. Salter, Esq. (the counsel for the British consul, and who had also been his counsel in the matter), that the sum asked for by him would be a fair and reasonable compensation for his services as such committee. Upon the petition and affidavit Judge VAN BRUNT granted an order, directing Henry Gamble, Esq., the committee of the lunatic at Bombay, through his counsel and attorney James P. Lowery, Esq., and Heera Baee, the wife of the lunatic, through Buckham Sonales and Walker, Esqs., her attorneys and counsel, to show cause before him why the prayer of the petitioner should not be

In the Matter of Bomanjee Byramjee Colah, a Lunatic.

granted. On the return of the order to show cause, and the appearance of all parties, the same judge made a further order referring it to Wm. C. Traphagen, Esq., to report upon the amount of compensation which should be allowed to the committee. Upon the reference no evidence was taken as to the value of the services of the committee, but a stipulation was made by the attorneys for the opposing parties (the committee of the person appointed in Bombay, and the wife of the lunatic), by which, for the purpose of facilitating the proceeding, and of avoiding the necessity of evidence as to the value of the services of Mr. Jarvis (the committee of the estate of the lunatic), it was admitted, that "independently of and beyond the mere receipt of the moneys that had come into Mr. Jarvis' hands, as committee of the estate, he had (in his co-operation in recovering from Mitchell & Read certain moneys belonging to the estate; in his personal oversight over the case, and attention given the lunatic while in this country, and in his attendance upon the several motions, petitions and proceedings had therein), rendered and performed services to the lunatic and his estate which he was not legally called upon to render under his appointment, which were both valuable and beneficial to the estate;" and that an allowance of five thousand dollars would be reasonable and proper, provided there was any power in this court to make him such allowance.

The counsel for the opposing parties contended, however, that the court had no power to allow the committee more than the sum to which the commissions of an executor or guardian upon the sums received by him would amount, viz., $1,801 21.

The referee reported that $5,000 ought to be allowed to the committee, and the Judge Van Brunt, at special term, confirmed the report, and authorized the committee to draw that sum out of the funds of the estate.

On making the order, he filed an opinion in which he stated his grounds for making it, as follows: " It is claimed that the court has no power to allow Mr. Jarvis a greater sum than eighteen hundred and one 21-100ths ($1,801 21) for his said services, being the amount to which the commission of an exec-

In the Matter of Bomanjee Byramjee Colah, a Lunatic.

utor or guardian would amount upon the sums received by him. Upon an investigation of the law in respect to the compensation to be allowed to executors, guardians, committees of the person and estate of lunatics, &c., receivers, and trustees, it is difficult to see any foundation for the denial of the power of the court to fix, according to its discretion, the compensation to be allowed to the committee of the estate of a lunatic. It may not be without profit that we should consider the course of legislation upon the subject of compensation to executors, guardians, trustees, committees, and receivers. In 1817 the Legislature passed an act authorizing compensation to be awarded guardians, executors, and administrators, at a rate which should be fixed by the chancellor, and thereupon the chancellor settled this rate by rule. The question as to the compensation of a committee of a lunatic's estate having come up before the chancellor, he held that such a case came within the equity of the statute, and he adopted the rate of compensation allowed to executors as a reasonable one (*Matter of Roberts*, 3 Johns. Ch. 43). In the Revised Statutes, the rule of the chancellor, in respect to the commission to be allowed to an executor or guardian, was adopted. The same question arose after the passage of the Revised Statutes, in the *Matter of Livingstone* (9 Paige, 440), where the chancellor held that he was not *authorized* to allow greater compensation to a committee of a lunatic than the commissions which an executor would be entitled to receive, and this decision was affirmed (2 Denio, 575). These are the only cases to which my attention has been called, in which the question has been discussed. The cases of *Vanderheyden* v. *Vanderheyden* (2 Paige, 287); *McWharton* v. *Benson* (Hopkins, 28); *Matter of Bank of Niagara* (6 Paige, 213); *Bennisso* v. *Paige* (1 Keyes, 92), only decide that where the statute fixed the compensation of an executor or receiver, that no greater sum can be allowed.

"It is difficult to see, upon an examination of that case, upon what ground it was held that the court was not authorized to make a greater compensation to the committee of a lunatic than to an executor. The want of authority seems to have rested entirely upon disinclination, and to have had no other founda-

tion. The idea which long prevailed that no allowances whatever would be made where compensation was not fixed by statute to an amount exceeding that provided for executors, was exploded by the decision of the case of *Gardiner* v. *Tyler* (3 Keyes, 505), where the court held that the statutory provision, fixing the commissions of executors and guardians, does not apply to receivers appointed under the code, and that receivers are officers of the court, and as such, in the absence of legislation, the court has authority to determine their compensation.

" The statute in respect to the appointment of committees of the person and estate of lunatics is entirely silent as to the question of compensation, and it is easily to be seen that it would be impossible, certainly as far as the compensation of the committee of the person is concerned, to fix such compensation by any arbitrary or .inflexible rule, because the value of such services necessarily depends upon the exigencies of each particular case.

" If the compensation to committees of this character is to be governed by the statute regulating the commissions of executors and guardians, then there is no power in the court to allow any greater sum, as compensation to both these committees, than a sum to which such commissions would amount; and that, in this case, the committee of the person having been paid for his services a sum greater than this, there is nothing left with which to pay the services of the committee of the estate. If this view is correct, then certainly the counsel have erred, as they claim, upon the *liberal* side, in not objecting to the payment of executor's commissions.

" The statute has fixed the amount of commissions to be allowed by law to the trustees of the estate of absconding, concealed, and non-resident debtors, of five per cent. (5 %) upon the whole sum which shall come into their hands; and I am entirely unable to see why, if we are to be governed by statutory commissions, those applicable to trustees of absconding debtors should not apply equally with those relating to the commissions of executors. There is no argument which can be urged in favor of the application of the rule fixing the rate of executor's commissions, which will not apply with equal force in favor of

the application of the rule fixing the commissions of the trustees of absconding debtors. The fact that the Legislature has been so particular in fixing the amount of the compensation of certain classes of trustees, and have been entirely silent as to the compensation to be allowed to committees of trustees, would seem to indicate that they intended to leave to the court the right to fix such compensation according to the requirements of each particular case. All the reasoning used by the learned judge in the case of *Gardiner* v. *Tyler*, in reference to receiver's compensation, is applicable to that of a committee of an estate of a lunatic.

" The committee of the estate of a lunatic is an officer of the court, precisely as much as a receiver of the estate and person of the lunatic are in the custody of the court, and the committees of the person and estate, as officers of the court, are subject to its orders and amenable to its summary process; and if the court have the power to fix the compensation of its officers in the absence of legislative enactment upon the subject, they have such authority as to the compensation of committees of the personal estate of a lunatic.

" It follows from these views that the court has the power to determine what would be a suitable compensation for the services of Mr. Jarvis, and to allow the same to him out of the estate of the lunatic."

Both the committee of the person of the lunatic appointed in Bombay, Henry Gamble, Esq., and also his wife Heera Baee, appealed from this order.

*Stephen A. Walker*, for Heera Baee, appellant.

*James P. Lowrey*, for Henry Gamble, committee of the person, appellant.

*A. Oakey Hall*, for respondent.

DALY, Chief Justice.—To avoid the necessity of evidence as to the value of the services of Mr. Jarvis, as committee of the estate, it was stipulated in writing by the attorneys of the ap-

pellants, who are the committee appointed for Colah by the court in Bombay, upon the arrival of the lunatic there, pursuant to the direction of this court, and the wife of Colah, residing in Bombay; that five thousand dollars, inclusive of the commission allowed by law, would be a reasonable and proper allowance to the committee if the court have any power to make an allowance, beyond the commission allowed by law. It is not questioned that the services of Mr. Jarvis in this case have been unusual and extraordinary; that they embraced services which he was not strictly bound to render, and that it was by a devotion of a large amount of his time, and especially by his activity and vigilance, that the money and property which this unfortunate East Indian merchant had with him, when he was found in this city bereft of reason, was secured and saved. Indeed, the appellants say in their points, that the stipulation was given to bring before the court the necessity of adhering to a well-established principle in a case where, if *disposition* rather. than *duty* prevailed, the rule would be disregarded, and I may add that this peculiar case has been so frequently and so fully before this court, that the fact is brought to our judicial knowledge, or it certainly has been to mine, that the getting and preservation of this property, or, indeed, I may say the rescue of a large part of it—nearly $70,000—was due to the unremitting efforts of the committee, and must have involved the devotion of a large amount of time.

It was held, by the unanimous decision of the Court of Appeals, in *Tyler* v. *Gardiner* (2 Abb. Ct. App. Dec. 247; 3 Keyes, 506), that the provisions of the Revised Statutes, fixing the allowance to be made for the services of guardians, executors and administrators, did not apply to a receiver, but that the court, by whom he is appointed, has the power to fix the rate of his compensation, according to the circumstances of the particular case. The judge below held that the reasons given for this decision by Judge Parker, by whom the opinion of the Court of Appeals was delivered, apply equally to a committee of a lunatic's estate, and I think the judge was right in that conclusion. The reasons given in respect to a receiver are: 1. That the statute does not fix the compensation of receivers, except in

In the Matter of Bomanjee Byramjee Colah, a Lunatic.

certain specified cases. 2. That the receiver is an officer of the court, and that the court, where there is no legislation to the contrary, has the authority to determine his compensation ; and 3. That by the established rule of the Court of Chancery, the compensation or salary to be allowed to a receiver, was left to be fixed by the master, with reference to the labor and trouble of the case. All this applies to the committee of a lunatic's estate. 1. He is not named in the statute, nor does he come under any one of the designations of guardian, executor or administrator. 2. He is an officer of the court (*Ex parte Ord*, Jac. R. 94), and the appointment cannot be controlled, even by a testamentary devise (*Ex parte Ludlow*, 2 P. Wms. 635). Upon the confirmation of the inquisition, the entire control over the lunatic and his estate is vested in the court (*In the Matter of Clapp*, 20 How. 389) ; and the committee, as its officer, acts in respect to the estate, by its authority and direction. He has to execute a bond, with two sureties, that he will faithfully perform his duty by conforming to the rules and practice of the court, and by observing its order and directions (2 Barb. Ch. R. 237, 663), (in the present case, the security is in $45,000) ; and, as a general rule, the committee cannot enter into any transaction or contract affecting the estate, nor pay any claim, nor institute any suit, without the sanction of the court (*L'Amoureaux* v. *Crosby*, 2 Paige, 428 ; *Gorham* v. *Gorham*, 3 Barb. Ch. R. 35, 36, 37 ; *In the Matter of Salisbury*, 3 Johns. Ch. R. 347 ; 2 Cary on Special Proceedings, and cases there cited, 27 to 30 ; 3 Adams' Doctrine of Equity, 294 to 299). By the authority of adjudged cases and the practice of the Court of Chancery, the committee of the estate may he allowed by the court, in proper cases, a compensation or salary for his care, labor and trouble in taking charge of the estate.

Lord Hardwick (*In re Annesly*, Amb. 78), said the committees of lunatics never have any allowance made to them for their trouble, that they were generally the relations or friends of the lunatic, who were supposed to have a regard for his welfare, and to undertake the case from charitable motives, and he refused to set a precedent; but as the management of the property in the case before him, was attended with great trouble, he

In the Matter of Bomanjee Byramjee Colah, a Lunatic.

directed the committee to present a petition for an increase of maintenance, and said he would then order an additional allowance, which was doing indirectly what might as well have been done directly.

Lord Eldon, in *Anon.* (10 Ves. 104), said that he did not recollect an instance of allowing the committee of an estate of a lunatic anything for his care and trouble, and he refused to make an order for an allowance.

This practice, which required parties to undertake gratuitously onerous duties, and give security for the exact and faithful discharge of them, produced its natural effect. Cases occurred (*Ex parte Warren*, 10 Ves. 622), in which no one was found willing to incur this serious responsibility without compensation or indemnity, and Lord Eldon, some sixteen years afterwards, had to recede from this rigid rule in *Ex parte Fermor* (*In re Errington*, Jac. p. 404). "If the question were," he said, " whether a committee is generally to receive a salary, I should say, No. But if the question were, whether there *may not be cases* where he ought to have a salary, I should say, Yes," and he made an order referring it to the master in that case, to ascertain what reasonable allowance under the peculiar circumstances of the case, it would be fit and proper to make to the committee for his care and pains in the management of the estate." *In re Palmer* (cited in Shelford on Lunacy, p. 165), the committee appointed, in consequence of the large amount of the security and the trouble he would be put to in collecting the rents and interest, refused to act, without some remuneration for his trouble, and Lord Lyndhurst referred it to the master to ascertain and settle, a reasonable and proper salary, to be allowed to the committee for taking care of the estate. *In re Smith* (also cited in Shelford, p. 166), was a similar case in which an order was made referring it to the master to appoint a proper person with a reasonable salary, and that the court can and will in a proper case make such an allowance I think may be regarded as settled by the cases above cited, and in the *Matter of Errington* (2 Russ. 567). The rule as now understood is thus stated by Adams, a very careful and reliable elementary writer. " Under *special circum-*

*stances* remuneration may be given to a committee; but the general rule is, that a committee, like any other trustee, is not entitled to remuneration, but to reimbursement alone." Adams Doctrine of Equity, 293, and Shelford after stating the general rule as above, says, " but under particular circumstances, the allowance for maintenance has been increased or a reasonable compensation for trouble allowed " (Shelford on Lunacy, 162, 163).

In consequence of the rigid rule of Lord Eldon in *Anon.* (10 Ves. 104), that no allowance could be made to the committee of the estate for his care and trouble, the practice grew up of having a committee of the person, a committee of the estate and a receiver. In *Ex parte Warren* (10 Ves. 621), no one could be procured who would act as committee, and it was proposed in the petition, that a receiver should be appointed, with a salary, but who should be considered as a committee and give security as such. Lord Eldon said that if he gave security, it was not material whether he was called a committee or a receiver, and he made the order accordingly. *In the Matter of Radcliffe* (1 Jac. & Walk. 619), the person appointed refused to act without compensation, and no person could be found who would act gratuitously. "If," said Lord Eldon, "you cannot get a committee, you must have a receiver." A receiver was accordingly appointed, and afterwards, it being necessary to institute a suit in respect to the lunatic's property, a committee was appointed for the care and management of the estate, without security, and who, by the order appointing him, was restrained from receiving any part of the property or effects of the lunatic. *Radcliffe* v. *Carter* (1 C. P. Cook, P. C. 253). At an earlier period, in *Ex parte Billinghurst*, (Amb. 103), where the next of kin and heir at law declining to be the committee of the estate, from his circumstances and inability to give the requisite security, Lord Hardwick appointed him committee of the person and of the estate, restricting him, however, from receiving any money, and referred it to the master to appoint a receiver. Where the practice is followed of having a committee of the person and of the estate, and a receiver, the receiver alone receives compensation, and the

committee of the estate merely gives a nominal security (Elmer on Lunacy, pp. 46, 47).

By the lunacy regulation act of 1853, and the act of 1855, amending and explaining it, very material changes were made in England in the law as respects the course of procedure in cases of lunacy. Under these acts there are masters in lunacy who exercise many powers formerly exercised by the Lord Chancellor alone, and he and the Lord Justices were by these acts empowered to, and did establish general orders for the regulation of the whole course of procedure. By these acts, a committee of the estate can alone make leases, conveyances, or deeds of partition under the order of the Lord Chancellor, and a receiver may be appointed for the management of the estate, who is to be allowed by the masters of lunacy a reasonable salary for his care and trouble, and under these acts and general orders, it is, in certain cases, necessary that both a receiver and a committee of the estate be appointed; but there being no necessity by statute or by any orders or rules established under statutes, for any such course of procedure with us, the committee of the estate with us, does all in respect to the estate that is done in England, either by the receiver or by the committee of the estate, and should therefor be compensated as the receiver in England is, for his care and trouble in the management of it.

By the act of 15th April, 1817, c. 251, the Court of Chancery was authorized to make a reasonable allowance to guardians, executors and administrators over and above their expenses, for their services, and the act declared that when the rate of allowances was settled by the chancellor, it should be conformed to in all cases of the settlement of such accounts, and the rate of allowance established by the chancellor, has been established as the rate by the Revised Statutes. Before the passage of this act, no allowance whatever was made to guardians, executors, and administrators for their care or trouble.

*In the Matter of Roberts* (3 Johns. Ch. R. 43), the committee of the estate of a lunatic applied for an allowance for his services. Chancellor Kent thought the case within the equity of the statute, and adopted and allowed what he thought a reason-

In the Matter of Bomanjee Byramjee Colah, a Lunatic.

able rate of compensation, and shortly afterwards, on the 17th of October, 1817, he adopted a general rule establishing the same rate of allowance to guardians, executors and administrators, in compliance with the statute (See Rule, 3 Johns. Ch. 630). Chancellor Kent evidently regarded the committee of an estate as coming under the same rule which forbids any compensation to guardians, executors and adminstrators, and he might well do so after Lord Eldon's decision in *Anon.* (10 Ves. 104), which had been decided in 1804, and had not then been receded from by the subsequent decisions of Lord Eldon before referred to, of *Ex parte Fermor, In re Errington,* which were decided in 1821. Chancellor Kent's authority to establish a fixed rate of compensation under the statute, and which by the statute was to be conformed to in all subsequent cases, extended only to guardians, executors and administrators, and did not embrace either a receiver or a committee of a lunatic's estate. The allowance, therefore, which he made in that case to a committee of an estate of a lunatic, did not bind and control all future allowances to such committees, for the statute of 1817 had made no such provision, nor is any such intent to be inferred for the position, obligations, and duties of a receiver and a committee of a lunatic's estate are, in many respects, different from those of guardians, executors and administrators. The committee of a lunatic's estate, where he gives security and takes charge of the estate under the direction of the court, is substantially a receiver. It is not material, as Lord Eldon said in the case I have cited, whether you call him a committee or a receiver; for his duties and obligations are in effect, substantially the same, and as in the case of a receiver, from the peculiar nature of the duties, the allowance, to be adequate and just, if any is made, should depend upon the circumstances of the particular case.

Chancellor Sanford, in *Mc Worther* v. *Benson* (Hopk. R. 28), in construing the statute of 1817, has gone at great length into the reasons why there should be a fixed rate established in respect to the compensation of guardians, executors and administrators; and while the reasons given as applied to them are generally pertinent and just, they do not apply with the same force to receivers, or committees of the estates of lunatics. He

remarks that, in general, the personal labor of this class of trustees, guardians, executors and administrators, is not great; that vigilance and fidelity are generally the most important requisites; that each one of those trustees has great power and great latitude of discretion; that he determines what shall be done, and performs the service without direction from any constituent, and without the control and vigilance which other principals hold over other agents. That it is, therefore, required, by the most obvious policy, that these trusts should never become lucrative occupations. It is the converse with regard to receivers and committees of estates. They have not "great power or great latitude of discretion;" nor do they determine what is to be done. On the contrary, they act under the instructions and direct control of the court, and can do nothing materially affecting the estate without the permission of the court. Their personal labor is greater from this circumstance, and this case itself, which is a peculiar one, with which I have had a great deal to do, may be taken as an illustration from the necessity which has occurred on the part of the committee of obtaining the direction and sanction of the court in nearly every stage of its progress. The reason given why the services of guardians, executors and administrators should be measured by a fixed standard, to be the same in all cases, is that they should, in consequence of their large powers and discretion, have no motive to do anything in respect to the estate with a view to increasing their own compensation; the presumption being that they will act disinterestedly and faithfully, as nothing which they do will have any effect upon the amount which they are to receive for their whole service; that amount, whether adequate or not, being fixed by law, and being uniform in all cases. But as the committee of a lunatic can do nothing materially affecting the estate without the authority of the court, and acts throughout under its direction, a fixed measure does not apply with the same force.

When the rule was that guardians, executors and administrators should receive nothing for their care and trouble, and after, when compensation was given to them by statute, their right to employ others in the management of this trust, under their di-

rection, was fully recognized and allowed as charges and expenses in the management of the trust (*Hetherhill* v. *Hales*, 2 Ch. Rep. 83 ; *Fearns* v. *Young*, 10 Ves. 184; *Green* v. *Winter*, 1 Johns. C. 38, 39). I mention this to point out more clearly the obvious distinction between them and receivers or committees of estates. The large power and discretion which they have and can exercise in doing what may be necessary in the management of the estate is, in the case of a lunatic's estate, vested in the court, and, therefore, the committee of the lunatic must apply to the court and obtain its sanction when anything material is to be done. For instance, they cannot lease without permission (*Foster* v. *Marchant*, 1 Vern. 262 ; *In re Wilkins*, 6 Jur. 308) ; and where alterations, additions, or. improvements are requisite, they must apply to the court before undertaking them (*Anon.* 10 Ves. 104 ; *In re Buckle*, 8 L. J. [N. S.] c. 264) ; further, if they rebuild or enlarge a house to a greater extent, and involving a larger expenditure than the court allowed, they will be charged with the excess, even though what was done was beneficial to the estate (*In re Langham*, 2 Ch. 299); and, as a general rule, there can be no expenditure by the committee of a lunatic's estate, unless it has been previously allowed (*Ex parte Martow*, 11 Ves. 397 ; *Ex parte Hilbert*, Id. 398), the same rule being applied to them that is applied to receivers (*Blunt* v. *Clitherow*, 6 Ves. 799). In the *Matter of Brown* (1 Mac. & G. 201), the committee, with the sanction of the master, employed an agent conversant with agricultural affairs, to superintend the details of the management of the estate, an act which Lord Cottenham thought it was competent for them to do. But in the *Matter of Errington* (2 Russ. 567), where an agent of this kind was thought requisite, the committee applied to the court, which was undoubtedly the proper course. It was objected, when the application was made, that what was asked formed a part of the very duty for which an allowance of five per cent. upon the rents was made to the committee; but the court, in view of the peculiar circumstances, allowed the committee to employ a farmer at a salary to occasionally view the different farms belonging to the lunatic, and see that the covenants were faithfully kept. In

fact, the committee is the subordinate of the court. He is simply its officer, and in the employment of others and in the general discharge of his duties, his relation to the court is that of an agent to his principal. Adams points out the material distinction which exists between the guardian of an infant and the committee of a lunatic, from the difference of the jurisdiction. "The origin of this distinction," he says, "seems referable to the fact that the crown, in the event of idiocy or lunacy, has not a mere authority to protect, but *an actual interest in the land* of the idiot or lunatic, determinable on his recovery or death. If the owner is an idiot, the profits are applied as a branch of the revenue, subject merely to his requisite maintenance; if he is a lunatic, they are applied on trust for his support, and the surplus is to be accounted for to himself or to his representative. In either case there is an interest vested in the crown" (Adams' Doctrine of Equity, 290, 291; and see also, as to the history and nature of this jurisdiction, *Winthrop* v. *Winthrop*, 1 Coop. 198, 199, 200, 201). This is very different from guardians, executors and administrators, and the relation which they hold to the court or the court to them. The estate after inquisition found being vested in the court until the lunatic's recovery or death, the committee, as I have said, is the mere subordinate of the court. He is appointed to do what the court cannot do itself, attend to the details connected with the management of the estate, and there is no reason why he, any more than a receiver, should be expected to perform this service gratuitously.

*In the Matter of Livingston* (9 Paige, 440), Chancellor Walworth held that the court of chancery was not authorized to allow the committee of the person and estate of a lunatic any greater or different compensation than that fixed by the Revised Statutes for guardians, executors or administrators. I think that I have sufficiently shown that this decision was erroneous. Chancellor Walworth gives no reason why the statute of 1817 and the provision in the Revised Statutes, apply to a committee of a lunatic's estate. He says that he was not aware of any case prior to 1817 in which the court of chancery had allowed direct compensation to a committee of a lunatic for his

In the Matter of Bomanjee Byramjee Colah, a Lunatic.

personal services, but admits that afterwards, Lord Eldon set a precedent in the *Matter of Errington* (*supra*); that Chancellor Kent, in the *Matter of Roberts* (*supra*), held that a committee of the estate of a lunatic was within the equity of the statute of 1817, and that Chancellor Hopkins decided in *Mc Whorter* v. *Benson* (*supra*), that the court was only authorized to make allowances in *such cases* according to a fixed rule or rate, and could not vary it according to the circumstances of the particular case. . The case before Chancellor Hopkins was the case of an executor and not of the committee of a lunatic's estate, and what he held had reference to guardians, executors and administrators, under the statute. Chancellor Kent thought the case of a committee of a lunatic was within the equity of the statute of 1817, because the statute provided for a remuneration to guardians, executors and administrators, and as no direct remuneration had, up to that time, been allowed in any case by the Court of Chancery to a committee of a lunatic, he thought the case was within the equity of the statute, which was rather a loose rule of construction. The fact no doubt was that he was impressed with the injustice of refusing any compensation at all to a committee of a lunatic's estate, when it was allowed by statute in the case of guardians, executors and administrators, and he evidently thought that the court had the power to make the same allowance to them that was given by statute in the case of guardians, executors and administrators. Had the decisions of Lord Eldon and Lord Lyndhurst, that the court have the power and will, in a proper case, make such an allowance, been then rendered, Chancellor Kent would have been relieved of all difficulty, and would not have ·had occasion to rest solely upon what he termed the equity of the statute. His decision, therefore, is not to be taken as an authority that the statute applies a fixed rate, and that such compensation is the only one to be allowed to committees of lunatics' estates, when in fact it says nothing about them at all. When Chancellor Walworth, however, delivered his opinion in the *Matter of Livingston*, these subsequent English decisions had been made, and though he refers to Lord Eldon's decision in *Anon.* (10 Ves. 104), as setting a precedent, he makes no ref-

erence to the decisions of Lord Lyndhurst in the cases of Palmer and of Smith (*supra*). Without noticing, and probably without being familiar with these cases, he states as the general rule, that "the Court of Chancery in England still adheres to the ancient practice of not allowing anything to the committee for his care and trouble in the management of the lunatic's estate beyond his actual expenses and disbursements;" without giving the important qualification or exception, which the decisions of Lord Eldon and Lord Lyndhurst have established, that the court can and will do so in a proper case.

That this is a proper case is conceded by the stipulation, for all that has been discussed upon the appeal is whether the court has the power. The policy which *formerly* regarded such trusts as honorary trusts, usually undertaken by relatives or friends out of regard for the welfare of the lunatic, and from charitable motives, has no application to a case like this. The unfortunate man deprived of reason in this instance, is one of the race in India known as the Parsees. Without friends, relatives or any one who knew anything about him, he was found in a deranged state at a hotel in this city, with a considerable sum of money, drafts and other securities in his possession, a large portion of which money was taken by one of the proprietors of the hotel and deposited as his own property in a trust company, and from whom it was subsequently obtained by the committee with difficulty. All that was known respecting the lunatic was his name found upon a card in his possession, with the description upon it of "Parsee Merchant Indiaman," upon which the British consul was applied to and that officer brought the case before this court, that an inquisition might be found, and the care of his person and his property committed to the court. Mr. Jarvis was appointed the committee of his estate, and it was through diligent inquiry instituted by him in London, that it was found that Colah came from Bombay; that he was a native of that city, where his father had been a prominent merchant; that he was a man of family, and that his wife and children were then living in Bombay. When the committee was appointed but $33,000 came into his possession, and it was through his exertions and efforts that nearly the whole of it was rescued,

In the Matter of Bomanjee Byramjee Colah, a Lunatic.

amounting to about $100,000. Colah's relatives in Bombay were advised by the committee of his situation here and of what had been done, which information was followed up by his father-in-law coming from Bombay to this city, and making a persistent effort to induce this court to surrender up the property and the custody of Colah to him, which the court after a very full examination refused, and sent Colah, in charge of the committee of his person, and of a physician, to Bombay, at the expense of the estate (*In the Matter of Colah*, 3 Daly, 529), where a committee of his person and estate was appointed; the property which he had here, however, remaining in the custody of this court. The committee has gathered in the property and invested it in safe securities under the direction of the court, out of the proceeds of which the necessary funds are regularly transmitted to Bombay for the support of Colah and his wife and family. A great variety of duties, involving the consumption of time, have been imposed upon the committee growing out of the litigation from the beginning, and especially on the part of the representatives of the relatives of Colah and of the committee in Bombay, from the time that the relatives were advised of the fact that Colah was here and what had been done respecting him. These legal expenses, and the expense of sending Colah to Bombay, have imposed a heavy charge upon the estate, and in addition to the duties incident to the gathering in of the estate, a great many payments have been made by the committee. I know of no case before this court, and I apprehend such cases are uncommon, in which so many duties involving intelligent action, vigilance, watchfulness, labor and the consumption of time have occurred, as in this, and which make it a proper case for giving an allowance as a compensation for the service rendered. In my view the statute respecting the compensation of guardians, executors and administrators has nothing to do with regulating the allowance, and as the appellants have agreed upon what is a proper sum, and the committee has acquiesced in that amount, and the judge below has allowed it, his order should be affirmed.

J. F. DALY and LOEW, JJ., concurred.

Order affirmed.